**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CORNELIA LASHAWN TOOMER | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | |
| FEDERAL RESERVE BANK | ) | **JURY TRIAL DEMANDED** |
| ST. LOUIS, | ) | |
| Serve: | ) | |
| James Lang | ) | |
| Federal Reserve Bank of St. Louis | ) | |
| 1 Federal Reserve Bank Plaza | ) | |
| Saint Louis, MO 63102 | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

COMES NOW Plaintiff Cornelia LaShawn Toomer and for her Complaint of discrimination and retaliation states as follows:

**PARTIES**

1. Plaintiff Toomer is an African American female.

2. At all times relevant to the actions alleged herein, Plaintiff was employed by the Federal Reserve Bank St. Louis (hereinafter "FRB STL"), which is a part of the United States Federal Reserve System.

3. United States Federal Reserve System is the central bank of the United States. It was funded by Congress in 1913.

4. The United States Federal Reserve System is a federal system, composed of a central agency - the Board of Governors and twelve regional Federal Reserve Banks. The Board and the Reserve Banks share responsibility for supervising and regulating certain financial institutions and activities, for providing banking services to depository institutions and the

1

federal government.

5. A network of twelve Federal Reserve Banks and their Branches carries out a variety of System functions, including operating a nationwide payments system, distributing the nation's currency and coin, supervising and regulating member banks and bank holding companies, and serving as banker for the U.S. Treasury.

6. The twelve Reserve Banks are each responsible for a particular geographic area or district of the United States.

7. FRB STL serves the Eighth Federal Reserve District, which includes Missouri, Illinois, Indiana, Kentucky, Tennessee, Mississippi, and Arkansas.

8. The Board of Governors have broad oversight responsibility for the operations and activities of the Federal Reserve Banks and their Branches.

9. The Reserve Banks are the operating arms of the United States Federal Reserve System. They combine both public and private elements in their makeup and organization.

10. The directors of each Federal Reserve Board oversee the day-to-day operations of their bank.

11. At all relevant times FRB STL has been authorized to do business in the State of Missouri.

12. At all relevant times, FRB STL employed more than 15 employees for at least 20 workweeks per year at the facility for which Plaintiff worked.

## JURISDICTION AND VENUE

13. Jurisdiction of this Court is founded upon 28 U.S.C. §1331 and 1343, as well as 42 U.S.C. § 2000e-5(f)(1) and (3).

14. Venue is appropriate under 28 U.S.C. §1391(b), 42 U.S.C. §2000e-5(f)(3) and 28

U.S.C. § 1391 because the unlawful employment practices alleged herein occurred in St. Louis, Missouri, where FRB STL is located and employed Plaintiff.

15. Plaintiff has satisfied the administrative prerequisites to suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq* ("Title VII").

16. On or about February 12, 2019, Plaintiff filed a Charge of Discrimination against the "Federal Reserve Bank" with the Equal Employment Opportunity Commission (EEOC). It was designated as Charge Number 510-2019-01873.

17. On June 13, 2019, Plaintiff amended the EEOC charge of discrimination by correcting a naming misnomer and named Defendant Federal Reserve Bank St. Louis as a Respondent.

18. Charge Number 510-2019-01873 was assigned to Federal Reserve Bank Atlanta (hereinafter "FRB ATL").

19. Charge Number 510-2020-04286 was assigned to FRB STL.

20. On December 31, 2019, Plaintiff amended Charge Number 510-2020-04286 to add a claim for retaliation.

21. On September 4, 2020, the EEOC issued to Plaintiff a Notice of Right to Sue against FRB STL (Charge Number 510-2020-04286).

22. This lawsuit has been filed within ninety days of issuance of the Notice of Right to Sue.

## FACTS COMMON TO ALL CLAIMS

23. At the time FRB STL hired Plaintiff, she had already built a long career in the Federal Reserve Bank System.

24. FRB ATL first hired Plaintiff in 1993 and Plaintiff worked there for four years as

3

a Senior Executive Assistant.

25. In 1997, Plaintiff resigned for a different job opportunity, but rejoined FRB ATL as a Senior Executive Assistant in 2007.

26. During her tenure with FRB ATL, Plaintiff was awarded the "Key Player Award," and the "Pat Barron Legacy Award."

27. During her tenure at FRB ATL, Plaintiff earned her Master's Degree in Project Management.

28. In 2014, Plaintiff moved to Jacksonville, Florida and worked for FRB ATL remotely.

29. In 2015, FRB STL posted the position of Supervision Learning Analyst (hereinafter "SVL Analyst") on its website.

30. FRB STL oversees the Federal Reserve System's "Supervision Learning Office" (the "SVL"), which develops, maintains, and operates the Federal Reserve Bank's national bank examiner training programs.

31. In October 2015, Plaintiff submitted her application for the SVL Analyst position to Defendant FRB STL.

32. Susan Black and Kathryn Kelly, managers at FRB STL, interviewed Plaintiff.

33. After the interview, Black offered Plaintiff the SVL Analyst position.

34. When Plaintiff was hired by FRB STL, it was determined that "due to the permanent nature of the [SVL] SSO Analyst position, FRB ATL has authorization to backfill the vacated position…"

35. In other words, Plaintiff's position with FRB STL was expected to be permanent and she no longer had a position at FRB ATL, as she was being replaced.

4

36. As an SVL analyst for FRB STL, Plaintiff conducted process improvement for the Supervision Learning Office.

37. Some of Plaintiff's duties included assisting employees with training, reviewing curriculum, improving learning processes, and working with external vendors for examiners. Plaintiff monitored training registrations and coordinated trainings for examiners.

38. Plaintiff held the SVL analyst position from October of 2015 to December 31, 2019.

39. From October of 2015 until December 31, 2019, FRB STL controlled the terms and conditions of Plaintiff's employment.

40. Plaintiff's work time was solely devoted to FRB STL.

41. Plaintiff performed no work for FRB ATL from October of 2015 to December 31, 2019.

42. In fact, Plaintiff was advised, "Given the amount of work anticipated, [Plaintiff] will not have additional capacity to contribute to [FRB ATL] projects or initiatives."

43. FRB STL was the only bank that could assign work to Plaintiff.

44. FRB STL was the only bank that did assign work to Plaintiff.

45. FRB STL delegated work to Plaintiff and determined deadlines for such work.

46. If Plaintiff wanted to take vacation or adjust her schedule, she had to receive permission from FRB STL.

47. Plaintiff recorded her work attendance in FRB STL's software called "Pinpoint."

48. FRB STL's Operations Manager Kathryn Kelly was Plaintiff's direct supervisor.

49. Plaintiff did not report to anyone in FRB ATL.

50. FRB STL established Plaintiff's work objectives.

51. FRB STL determined Plaintiff's rate of compensation.

52. FRB STL gave Plaintiff feedback and managed Plaintiff' job performance.

53. From October of 2015 until December 11, 2019, FRB STL conducted Plaintiff's performance reviews.

54. FRB STL determined Plaintiff's work schedule.

55. Although she worked remotely, Plaintiff flew to St. Louis at least twice a year for team meetings.

56. Plaintiff did not travel to Atlanta for work obligations.

57. In addition to Kelly's supervision, Plaintiff Toomer had monthly meetings with Kelly's supervisor, Susan Black.

58. During these meetings, Plaintiff told Black about her progress in different work assignments and projects.

59. Plaintiff met weekly with Kathryn Kelly. Kelly and Plaintiff discussed Plaintiff's work progress and projects during these meetings.

60. Kelly also discussed Plaintiff's opportunities for promotion in these meetings. She suggested that if Plaintiff completed certain milestones, such as working with multiple lines of business, she would be eligible for a Senior Analyst position at FRB STL.

61. Plaintiff successfully completed these milestones.

62. Plaintiff led large scale projects and worked across multiple business lines.

63. Plaintiff was never awarded any promotional opportunity by FRB STL

64. In mid-2018, Plaintiff's supervisors (Kelly and Black) began treating her worse than her Caucasian peers by giving her a heavier workload, decreasing her pay, and refusing to promote her.

65. For instance, in July of 2018, when a Senior Analyst on Plaintiff's team resigned, Kelly added the departing employee's workload to Plaintiff's workload.

66. Though Plaintiff began performing the work of a Senior Analyst, she did not receive an increase in pay or a promotion to the Senior Analyst position.

67. Instead, FRB STL sought to cut Plaintiff's pay by more than 20% after nearly doubling her work duties.

68. In September of 2018, Jennifer Gibilterra, Assistant Vice President at FRB ATL, told Plaintiff that FRB STL would start paying her salary as of January 1, 2020.

69. Though Plaintiff worked at the direction of FRB STL, FRB ATL paid her salary under a "cross-district employment policy."

70. During the September 2018 meeting, Gibilterra told Plaintiff that Susan Black at FRB STL made the decision to decrease Plaintiff's salary by $20,000.

71. Gibilterra assured Plaintiff that neither her position nor duties would change simply because payroll was processed from FRB STL.  Gibilterra confirmed that Plaintiff was not being terminated.

72. Gibilterra explained that Plaintiff could take the pay cut or quit, but she had until December of 2019 to consider her options.

73. One month later, in October of 2018, Black asked Plaintiff if she would accept pay cut or quit.

74. Black never suggested that Plaintiff would be involuntarily terminated.

75. When Plaintiff asked why her salary needed to be cut by $20,000, Black told her that it would put her in line with other analysts on the team.

76. The majority of the other SVL analysts on Plaintiff's team were Caucasian.

7

77. When Plaintiff replied to Black that she had more seniority and education that the other analysts on her team, Black responded that FRB STL wasn't crediting her seniority or education in determining her pay.

78. Plaintiff told Black that she felt like FRB STL was demoting her while increasing her workload.

79. The posted annual salary range for Plaintiff's position was approximately $59,000 to $85,000.

80. Plaintiff's salary in 2018 was $84,000.

81. Plaintiff told Black that her salary was within the range for her position.

82. On January 8, 2019, Kelly asked Plaintiff if she would take the pay cut or quit.

83. Because her managers continued to ask her if she would take the pay cut, Plaintiff felt pressured to make a decision immediately.

84. On January 16, 2019, Kelly told Plaintiff that she needed to cover the workload of a junior SVL analyst, Patty Timko, while she was out on maternity leave.

85. Plaintiff told Kelly that she was concerned that the workload of two positions would be too much. Kelly made it clear that Plaintiff did not have a choice in the matter.

86. Around the same time, FRB STL promoted Kristine Geisen to the position of Senior Analyst instead of Plaintiff.

87. Geisen (Caucasian) had less experience and seniority than Plaintiff.

88. In February 2019 Plaintiff filed a charge of race discrimination with the Equal Employment Opportunity Commission (EEOC).

89. The charge of discrimination identified Kelly and included the following instances of different treatment: Plaintiff's pay cut, the promotion of Geisen, and the additional

8

workload foisted on Plaintiff.

90. After Plaintiff filed the EEOC charge, FRB STL retaliated against her.

91. Black stopped meeting with Plaintiff monthly and Kelly ceased conversations about promotion opportunities.

92. In the summer of 2019, Whitney Farr, a Senior Analyst on Plaintiff's team, quit.

93. Again, Kelly and Black gave Farr's workload to Plaintiff. Yet, they did not change her title or increase her pay.

94. Overloaded with the stress of the pressure to take a demotion or be terminated, a constantly increasing workload, and retaliation from filing her charge of discrimination, Plaintiff took medical leave from July 29, 2019 to October 15, 2019.

95. After Plaintiff returned to work from her FMLA leave, she communicated to Kelly that she wanted to continue to work for FRB STL, even though she would receive a pay cut of $20,000.

96. On December 11, 2019, Black stated, "The Federal Reserve Bank of St. Louis will not be extending an offer of employment to you."

97. Black terminated Plaintiff's employment as of December 31, 2019.

98. Defendant, by its actions and failure to act, including but not limited to the conduct described above, discriminated against Plaintiff on account of her race and retaliated against Plaintiff when she opposed discrimination.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

99. Plaintiff incorporates here the allegations contained in paragraphs 1 through 98.

100. Plaintiff, as an African American person, is within a class protected from discrimination by Title VII.

9

101. Plaintiff was at all times qualified for her job as an employee of the FRB STL and met the legitimate expectations of her employer.

102. All actions taken against Plaintiff constitute adverse employment actions in violation of Title VII

103. Plaintiff's race was a motiving factor in FRB STL's decision to take the aforementioned adverse employment actions.

104. The aforementioned employment actions taken by FRB STL against Plaintiff were initiated intentionally, knowingly, maliciously, and in willful and wanton disregard and reckless indifference to Plaintiff's rights all in violation of Title VII.

105. The actions described above demonstrate that FRB STL discriminated against Plaintiff on the basis of her race in violation of Title VII.

106. As a result of FRB STL's actions and failures to act described herein, Plaintiff has suffered garden variety emotional pain, humiliation, inconvenience, mental anguish and loss of enjoyment of life.

107. As a result of FRB STL's actions and failures to act described herein, Plaintiff has lost income and benefits of employment and has incurred and will continue to incur attorney's fees, costs and expenses of suit.

108. FRB STL's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff and as such, warrants an award of punitive damages in such sum as will serve to punish FRB STL and to deter it and others from like conduct.

WHEREFORE, Plaintiff Toomer prays that this Court enter judgment in favor of Plaintiff and against Defendants for lost wages and other benefits of employment, compensatory damages, punitive damages, prejudgment interest, appropriate declaratory and injunctive relief, reinstatement

and/or front pay and other appropriate equitable relief, attorneys' fees and costs, all in an amount over $25,000.00, and for such additional relief as may be just under the circumstances.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII

109.    Plaintiff incorporates here the allegations contained in paragraphs 1 through 108.

110.    On December 11, 2019, FRB STL notified Plaintiff that her employment would end on December 31, 2019.

111.    Prior to her discharge, Plaintiff filed Charge of Discrimination with the EEOC against FRB STL for race discrimination.

112.    At the time of Plaintiff's discharge, FRB STL was aware of Plaintiff's Charge of Discrimination, and was aware she had opposed discrimination in the workplace.

113.    FRB STL retaliated against Plaintiff by discharging her for reporting discriminatory conduct occurring in the workplace, in violation of Title VII.

114.    Plaintiff's protected activity was a motivating factor in FRB STL's decision to terminate Plaintiff's employment.

115.    FRB STL's conduct is in violation of the Title VII.

116.    As a result of FRB STL's actions and failures to act described herein, Plaintiff has suffered garden variety emotional pain, humiliation, inconvenience, mental anguish and loss of enjoyment of life.

117.    As a result of FRB STL's actions and failures to act described herein, Plaintiff has lost income and benefits of employment and has incurred and will continue to incur attorney's fees, costs and expenses of suit.

118.    FRB STL's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff and as such, warrants an award of punitive damages in such

sum as will serve to punish FRB STL and to deter it and others from like conduct.

WHEREFORE, Plaintiff Toomer prays that this Court enter judgment in favor of Plaintiff and against Defendants for lost wages and other benefits of employment, compensatory damages, punitive damages, prejudgment interest, appropriate declaratory and injunctive relief, reinstatement and/or front pay and other appropriate equitable relief, attorneys' fees and costs, all in an amount over $25,000.00, and for such additional relief as may be just under the circumstances.

## COUNT III
## RACE DISCRIMINATION IN VIOLATION OF §1981

119. Plaintiff incorporates herein and makes a part hereof the allegations contained in paragraphs 1 through 118.

120. Plaintiff, as an African American person, is within a class protected from discrimination by 42 U.S.C. §1981.

121. Plaintiff was at all times qualified for her job as an employee of the FRB STL and met the legitimate expectations of her employer.

122. All actions taken against Plaintiff constitute adverse employment actions in violation of 42 U.S.C. §1981.

123. The actions by FRB STL described herein denied the Plaintiff the ability to make and enforce contracts in the same manner as enjoyed members of the Caucasian race.

124. When FRB STL directed Plaintiff to accept a $20,000 decrease in pay or resign, it altered her contractual relationship with FRB STL and denied her the ability to make and enforce contracts in the same manner as enjoyed by members of the Caucasian race.

125. When FRB STL terminated Plaintiff on December 11, 2019, it altered her contractual relationship with FRB STL and denied her the ability to make and enforce contracts in the same manner as enjoyed by members of the Caucasian race.

126. When FRB STL revoked an offer of employment to Plaintiff on December 11, 2019, it altered her contractual relationship with FRB STL and denied her the ability to make and enforce contracts in the same manner as enjoyed by members of the Caucasian race.

127. When FRB STL refused to extend an offer of employment to Plaintiff on December 11, 2019, it altered her contractual relationship with FRB STL and denied her the ability to make and enforce contracts in the same manner as enjoyed by members of the Caucasian race.

128. Plaintiff's race was a motiving factor in FRB STL's decision to take the aforementioned adverse employment actions.

129. The aforementioned employment actions taken by FRB STL against Plaintiff were initiated intentionally, knowingly, maliciously, and in willful and wanton disregard and reckless indifference to Plaintiff's rights all in violation of 42 U.S.C. §1981.

130. The actions described above demonstrate that FRB STL discriminated against Plaintiff on the basis of her race in violation of 42 U.S.C. §1981.

131. As a result of FRB STL's actions and failures to act described herein, Plaintiff has suffered garden variety emotional pain, humiliation, inconvenience, mental anguish and loss of enjoyment of life.

132. As a result of FRB STL's actions and failures to act described herein, Plaintiff has lost income and benefits of employment and has incurred and will continue to incur attorney's fees, costs and expenses of suit.

133. FRB STL's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff and as such, warrants an award of punitive damages in such sum as will serve to punish FRB STL and to deter it and others from like conduct.

WHEREFORE, Plaintiff Toomer prays that this Court enter judgment in favor of Plaintiff and against Defendants for lost wages and other benefits of employment, compensatory damages, punitive damages, prejudgment interest, appropriate declaratory and injunctive relief, reinstatement and/or front pay and other appropriate equitable relief, attorneys' fees and costs, all in an amount over $25,000.00, and for such additional relief as may be just under the circumstances.

## COUNT IV
## RETALIATION IN VIOLATION OF §1981

134. Plaintiff incorporates here the allegations contained in paragraphs 1 through 133.

135. Plaintiff complained of race discrimination against FRB STL.

136. At all relevant times, FRB STL was aware of Plaintiff's complaint of race discrimination, and was aware she had opposed discrimination in the workplace.

137. When FRB STL terminated Plaintiff on December 11, 2019, it altered her contractual relationship with FRB STL and denied her the ability to make and enforce contracts in the same manner as enjoyed by members of the Caucasian race.

138. FRB STL retaliated against Plaintiff by terminating her employment because she reported discriminatory conduct in the workplace, in violation of 42 U.S.C. §1981.

139. When FRB STL revoked an offer of employment to Plaintiff on December 11, 2019, it altered her contractual relationship with FRB STL and denied her the ability to make and enforce contracts in the same manner as enjoyed by members of the Caucasian race.

140. FRB STL retaliated against Plaintiff by revoking an offer of employment because she reported discriminatory conduct in the workplace, in violation of 42 U.S.C. §1981.

141. When FRB STL refused to extend an offer of employment to Plaintiff on December 11, 2019, it altered her contractual relationship with FRB STL and denied her the ability to make and enforce contracts in the same manner as enjoyed by members of the

Caucasian race.

142. FRB STL retaliated against Plaintiff by refusing to extend an offer of employment to Plaintiff because she reported discriminatory conduct in the workplace, in violation of 42 U.S.C. §1981.

143. Plaintiff's protected activity was a motivating factor in adverse actions taken against Plaintiff by FRB STL.

144. FRB STL's conduct is in violation of the 42 U.S.C. §1981.

145. As a result of FRB STL's actions and failures to act described herein, Plaintiff has suffered garden variety emotional pain, humiliation, inconvenience, mental anguish and loss of enjoyment of life.

146. As a result of FRB STL's actions and failures to act described herein, Plaintiff has lost income and benefits of employment and has incurred and will continue to incur attorney's fees, costs and expenses of suit.

147. FRB STL's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff and as such, warrants an award of punitive damages in such sum as will serve to punish FRB STL and to deter it and others from like conduct.

WHEREFORE, Plaintiff Toomer prays that this Court enter judgment in favor of Plaintiff and against Defendants for lost wages and other benefits of employment, compensatory damages, punitive damages, prejudgment interest, appropriate declaratory and injunctive relief, reinstatement and/or front pay and other appropriate equitable relief, attorneys' fees and costs, all in an amount over $25,000.00, and for such additional relief as may be just under the circumstances.

SEDEY HARPER WESTHOFF, P.C.

*Sarah N Swatosh*

_____
Sarah Swatosh #56633MO
Claire Bruner-Wiltse #69434MO
2711 Clifton Avenue
St. Louis, MO 63139
314/773-3566
314/773-3615 (fax)
sswatosh@sedeyharper.com
cbruner-wiltse@sedeyharper.com

Attorneys for Plaintiff