UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CORNELIA LASHAWN TOOMER,    )
   )
     Plaintiff,    )
   )
v.    )     CASE NO. 4:20CV1562 HEA
   )
FEDERAL RESERVE BANK ST. LOUIS,    )
   )
     Defendant,    )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Partial Dismissal, [Doc. No. 6]. Plaintiff opposes the motion, and the issues are fully briefed. For the reasons set forth below, the Motion is granted in part and denied in part.

### Facts and Background

Plaintiff filed this action against Defendant alleging discrimination and retaliation in her employment. The Complaint alleges race discrimination in violation of Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e, et seq. (Count I); race discrimination in violation of 42 U.S.C § 1981 (Count II), and retaliation for lodging complaints of race discrimination in violation of Title VII

(Count III) and § 1981 (Count IV).  Specifically, the Complaint  alleges the following facts:[1]

Plaintiff is an African American female. Plaintiff was employed by the Federal Reserve Bank St. Louis (hereinafter "FRB STL"), which is a part of the United States Federal Reserve System. United States Federal Reserve System is the central bank of the United States. It was funded by Congress in 1913. The United States Federal Reserve System is a federal system, composed of a central agency – the Board of Governors and twelve regional Federal Reserve Banks. The Board and the Reserve Banks share responsibility for supervising and regulating certain financial institutions and activities, for providing banking services to depository institutions and the federal government. A network of twelve Federal Reserve Banks and their Branches carries out a variety of System functions, including operating a nationwide payments system, distributing the nation's currency and coin, supervising, and regulating member banks and bank holding companies, and serving as banker for the U.S. Treasury. The twelve Reserve Banks are each responsible for a particular geographic area or district of the United States.

---

[1]  The recitation of facts is taken from Plaintiff's Complaint and is set forth for the purposes of this motion only.  It in no way relieves the parties of the necessary proof thereof in later proceedings.

FRB STL serves the Eighth Federal Reserve District, which includes

Missouri, Illinois, Indiana, Kentucky, Tennessee, Mississippi, and Arkansas. The

Board of Governors has broad oversight responsibility for the operations

and activities of the Federal Reserve Banks and their Branches. The Reserve Banks

are the operating arms of the United States Federal Reserve System. They combine

both public and private elements in their makeup and organization.

The directors of each Federal Reserve Board oversee the day-to-day operations of

their banks.

Plaintiff alleges the Court's jurisdiction is founded on 28 U.S.C. §1331 and

1343, as well as 42 U.S.C. § 2000e-5(f)(1) and (3). She further alleges that the

unlawful employment practices alleged in her Complaint occurred in St. Louis,

Missouri, where FRB STL is located and employed Plaintiff.

On February 12, 2019, Plaintiff filed a Charge of Discrimination against

the "Federal Reserve Bank" with the Equal Employment Opportunity Commission

(EEOC). It was designated as Charge Number 510-2019-01873. She amended her

charge on June 13, 2019 by correcting a naming misnomer and named Defendant

Federal Reserve Bank St. Louis as a Respondent. Charge Number 510-2019-01873

was assigned to Federal Reserve Bank Atlanta (hereinafter "FRB ATL"). Charge

Number 510-2020-04286 was assigned to FRB STL. On December 31, 2019,

Plaintiff amended Charge Number 510-2020-04286 to add a claim for retaliation.

On September 4, 2020, the EEOC issued a Notice of Right to Sue against FRB STL (Charge Number 510-2020-04286).

At the time FRB STL hired Plaintiff, she had already built a long career in the Federal Reserve Bank System. FRB ATL first hired Plaintiff in 1993 and Plaintiff worked there for four years as a Senior Executive Assistant. In 1997, Plaintiff resigned for a different job opportunity, but rejoined FRB ATL as a Senior Executive Assistant in 2007. During her tenure with FRB ATL, Plaintiff was awarded the "Key Player Award," and the "Pat Barron Legacy Award." During her tenure at FRB ATL, Plaintiff earned her master's degree in Project Management. In 2014, Plaintiff moved to Jacksonville, Florida and worked for FRB ATL remotely.

In 2015, FRB STL posted the position of Supervision Learning Analyst (hereinafter "SVL Analyst") on its website. FRB STL oversees the Federal Reserve System's "Supervision Learning Office" (the "SVL"), which develops, maintains, and operates the Federal Reserve Bank's national bank examiner training programs. In October 2015, Plaintiff submitted her application for the SVL Analyst position to Defendant FRB STL. Susan Black and Kathryn Kelly, managers at FRB STL, interviewed Plaintiff. After the interview, Black offered Plaintiff the SVL Analyst position. When Plaintiff was hired by FRB STL, it was determined that "due to the permanent nature of the [SVL] SSO Analyst position,

FRB ATL has authorization to backfill the vacated position..." Plaintiff's position with FRB STL was expected to be permanent and she no longer had a position at FRB ATL, as she was being replaced.

As an SVL analyst for FRB STL, Plaintiff conducted process improvement for the Supervision Learning Office. Some of Plaintiff's duties included assisting employees with training, reviewing curriculum, improving learning processes, and working with external vendors for examiners. Plaintiff monitored training registrations and coordinated trainings for examiners. Plaintiff held the SVL analyst position from October of 2015 to December 31, 2019.

From October of 2015 until December 31, 2019, FRB STL controlled the terms and conditions of Plaintiff's employment. Plaintiff's work time was solely devoted to FRB STL. 41. Plaintiff performed no work for FRB ATL from October of 2015 to December 31, 2019. Plaintiff was advised, "Given the amount of work anticipated, [Plaintiff] will not have additional capacity to contribute to [FRB ATL] projects or initiatives." FRB STL was the only bank that could assign work to Plaintiff. FRB STL was the only bank that did assign work to Plaintiff. FRB STL delegated work to Plaintiff and determined deadlines for such work. If Plaintiff wanted to take vacation or adjust her schedule, she had to receive permission from FRB STL. Plaintiff recorded her work attendance in FRB STL's software called "Pinpoint." FRB STL's Operations Manager Kathryn Kelly was

Plaintiff's direct supervisor. Plaintiff did not report to anyone in FRB ATL. FRB

STL established Plaintiff's work objectives. FRB STL determined Plaintiff's rate

of compensation. FRB STL gave Plaintiff feedback and managed Plaintiff' job

performance. From October of 2015 until December 11, 2019, FRB STL

conducted Plaintiff's performance reviews. FRB STL determined Plaintiff's work

schedule. Although she worked remotely, Plaintiff flew to St. Louis at least twice a

year for team meetings. Plaintiff did not travel to Atlanta for work obligations.

In addition to Kelly's supervision, Plaintiff had monthly meetings with

Kelly's supervisor, Susan Black. During these meetings, Plaintiff told Black about

her progress in different work assignments and projects.

Plaintiff met weekly with Kathryn Kelly. Kelly and Plaintiff discussed

Plaintiff's work progress and projects during these meetings. Kelly also discussed

Plaintiff's opportunities for promotion in these meetings. She suggested that if

Plaintiff completed certain milestones, such as working with multiple lines of

business, she would be eligible for a Senior Analyst position at FRB STL.

Plaintiff successfully completed these milestones. Plaintiff led large scale

projects and worked across multiple business lines. Plaintiff was never awarded

any promotional opportunity by FRB STL

In mid-2018, Plaintiff's supervisors (Kelly and Black) began treating her

worse than her Caucasian peers by giving her a heavier workload, decreasing her

pay, and refusing to promote her. She was given a departing employee's workload in July 2018. Though Plaintiff began performing the work of a Senior Analyst, she did not receive an increase in pay or a promotion to the Senior Analyst position. Instead, FRB STL sought to cut Plaintiff's pay by more than 20% after nearly doubling her work duties.

In September of 2018, Jennifer Gibilterra, Assistant Vice President at FRB ATL, told Plaintiff that FRB STL would start paying her salary as of January 1, 2020. Though Plaintiff worked at the direction of FRB STL, FRB ATL paid her salary under a "cross-district employment policy." During the September 2018 meeting, Gibilterra told Plaintiff that Susan Black at FRB STL made the decision to decrease Plaintiff's salary by $20,000. Gibilterra assured Plaintiff that neither her position nor duties would change simply because payroll was processed from FRB STL. Gibilterra confirmed that Plaintiff was not being terminated. Gibilterra explained that Plaintiff could take the pay cut or quit, but she had until December of 2019 to consider her options.

One month later, in October of 2018, Black asked Plaintiff if she would accept pay cut or quit. Black never suggested that Plaintiff would be involuntarily terminated. When Plaintiff asked why her salary needed to be cut by $20,000, Black told her that it would put her in line with other analysts on the team. The majority of the other SVL analysts on Plaintiff's team were Caucasian. When

Plaintiff replied to Black that she had more seniority and education that the
other analysts on her team, Black responded that FRB STL wasn't crediting her
seniority or education in determining her pay. Plaintiff told Black that she felt like
FRB STL was demoting her while increasing her workload. The posted annual
salary range for Plaintiff's position was approximately $59,000 to $85,000.
Plaintiff's salary in 2018 was $84,000. Plaintiff told Black that her salary was
within the range for her position.

On January 8, 2019, Kelly asked Plaintiff if she would take the pay cut or
quit. Because her managers continued to ask her if she would take the pay cut,
Plaintiff felt pressured to make a decision immediately. On January 16, 2019,
Kelly told Plaintiff that she needed to cover the workload of a junior SVL analyst,
while she was out on maternity leave. Plaintiff told Kelly that she was concerned
that the workload of two positions would be too much. Kelly made it clear that
Plaintiff did not have a choice in the matter.

Around the same time, FRB STL promoted a Caucasian woman to the
position of Senior Analyst instead of Plaintiff. This employee had less experience
and seniority than Plaintiff.

In February 2019 Plaintiff filed a charge of race discrimination with the
Equal Employment Opportunity Commission (EEOC). The charge of
discrimination identified Kelly and included the following instances of different

treatment: Plaintiff's pay cut, the promotion of the Caucasian woman, and the additional workload Plaintiff was given.

After Plaintiff filed the EEOC charge, FRB STL retaliated against her. Black stopped meeting with Plaintiff monthly and Kelly ceased conversations about promotion opportunities.

In the summer of 2019, a Senior Analyst on Plaintiff's team, quit. Kelly and Black gave this analyst's workload to Plaintiff. They did not change her title or increase her pay.

Plaintiff took medical leave from July 29, 2019 to October 15, 2019. After Plaintiff returned to work from her FMLA leave, she communicated to Kelly that she wanted to continue to work for FRB STL, even though she would receive a pay cut of $20,000. On December 11, 2019, Black stated, "The Federal Reserve Bank of St. Louis will not be extending an offer of employment to you." Black terminated Plaintiff's employment as of December 31, 2019.

Defendant moves to dismiss Plaintiff's Complaint with the exception of Plaintiff's failure to promote claim under 42 U.S.C. § 1981 for failure to state a claim.

### Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss all or part of a complaint for its failure to state a claim upon which relief

can be granted. To overcome a motion to dismiss under Rule 12(b)(6) a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet the plausibility standard, the complaint must contain "more than labels and conclusions." *Id*. at 555. Such a complaint will "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and will state a claim for relief that rises above mere speculation. *Twombly*, 550 U.S. at 555. In reviewing the pleadings under this standard, the Court must accept Plaintiff's factual allegations as true and draw all inferences in Plaintiff's favor, but the Court is not required to accept the legal conclusions Plaintiff draws from the facts alleged. *Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768-69 (8th Cir. 2012). The Court additionally "is not required to divine the litigant's intent and create claims that are not clearly raised, . . . and it need not conjure up unpled allegations to save a complaint." *Gregory v. Dillard's, Inc*., 565 F.3d 464, 473 (8th Cir. 2009) (en banc) (citations omitted).

## Discussion

**Plaintiff's Employer**

Defendant seeks to dismiss Plaintiff's claims of discrimination and retaliation under Title VII because it contends it was never Plaintiff's employer,

despite the allegations in the Complaint that Plaintiff was employed by FRB STL. In so arguing, Defendant asks the Court to consider Plaintiff's EEOC Charges and Defendant's position statement with the EEOC.  Defendant urges the Court to consider the EEOC proceedings because are described in the Complaint and "incorporated by reference," and as such, the Court may take judicial notice of the EEOC documents.  Initially, it should be noted that the Complaint did not incorporate the documents. Defendant asks the Court to take judicial notice of the public records in the EEOC proceedings regarding its position statement.

While a court may consider documents necessarily embraced by a complaint, but not attached, it may only do so for "documents whose contents are alleged in a complaint and whose authenticity no party questions." See *Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018). However, the Court will not take judicial notice of the content of the documents. Federal Rule of Evidence 201(b) allows a court to take judicial notice of "a fact that is not subject to reasonable dispute" either because it is generally known within the Court's jurisdiction or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The facts of which Defendants ask the Court to take judicial notice are disputed by Plaintiff. While the Court will take judicial notice of the filing of the charge and the fact that Defendant filed its position statement, it is

inappropriate for the Court to take judicial notice of the truth of the contents of the charge and Defendant's statement at the motion to dismiss stage.

Defendant argues that Counts I and II should be dismissed because FRB STL was not her employer.  Plaintiff responds by arguing the Complaint sets forth sufficient facts alleging FRB STL is her employer.

"[I]n order to prevail on [a] Title VII claim, [a plaintiff] must demonstrate that defendants were her 'employer.' " *Moland v. Bil–Mar Foods,* 994 F.Supp. 1061, 1068 (N.D.Iowa 1998) (citing *Devine v. Stone, Leyton & Gershman, P.C.,* 100 F.3d 78, 79 (8th Cir.1996)). *See Deal v. State Farm County Mut. Ins. Co. of Tex.,* 5 F.3d 117, 118 (5th Cir.1993) (affirming district court's order dismissing plaintiffs' Title VII and ADEA claims for lack of jurisdiction where plaintiff failed to establish that defendants were her employers); *Shah v. Littelfuse Inc.,* No. 12 CV 6845, 2013 WL 1828926, at *3 (N.D.Ill. April 29, 2013) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377, 380 (7th Cir.1991)) ("To maintain a cause of action for discriminatory discharge under Title VII, a plaintiff must allege the existence of an employment relationship"). In *Moland,* the plaintiff "concede[d] that she cannot prevail against defendants on her discrimination claims unless she can demonstrate the existence of an employer-employee relationship with defendants." *Moland,* 994 F.Supp. at 1068. Notwithstanding, the plaintiff there averred "that the extent and nature of the control asserted by

defendants over the work and workplace establishe[d] an employer-employee relationship between her and defendants for Title VII purposes." *Id.* To that end, the *Moland* court noted that whether a person qualifies as an "employee" under Title VII turns on federal law. *Id.*

In drawing its conclusions, the *Moland* court noted that three tests have been developed for determining whether a person may be defined as an employee: "(1) the common law agency test ...; (2) the economic realities test ...; and (3) the hybrid test, a combination of the common law agency and economic realities tests[.]" *Id.* The *Moland* court noted that the Eighth Circuit had expressly rejected the economic realities test in *Wilde v. County of Kandiyohi,* 15 F.3d 103, 106 (8th Cir.1994). Instead, the Eighth Circuit applies the hybrid test, which bears no significant distinction from the common law agency test. Applying the hybrid test, the definition of "employee" is interpreted against the backdrop of common law precepts. *Moland,* 994 F.Supp. at 1069 (quoting *Wilde,* 15 F.3d at 105). The test accounts for numerous factors related to the employment relationship; no one, however, is dispositive.

> This [hybrid] test calls for application of general principles of the law of agency to undisputed or established facts. Consideration of all of the circumstances surrounding the work relationship is essential, and no one factor is determinative. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here, as it is at common law.... If an employer has the right to control and direct the work of an individual, not only as to the

result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.

*Id.* at 1069–70 (quoting *Spirides v. Reinhardt,* 613 F.2d 826, 831–32

(D.C.Cir.1979)) (alteration in original). *See also* <u>Axness v. Aqreva LLC</u>, 118 F.

Supp. 3d 1144, 1154–56 (D.S.D. 2015).

With the foregoing in mind, Plaintiff's Complaint sufficiently alleges an

employment relationship between Plaintiff and FRB STL. Plaintiff alleges she was

employed by FR  ATL and applied for the position of Supervision Learning

Analyst, (SVL Analyst), with FRB STL. FRB STL oversees the Federal Reserve

System's Supervision Learning office.  Plaintiff interviewed with Blac and Kelly,

managers at FRB STL.  Black offered Plaintiff the position.  FRB ATL backfilled

Plaintiff's vacated position since the nature of the SVL Analyst position was

permanent.  During the time Plaintiff held the position, FRB STL controlled the

terms and conditions of Plaintiff's employment.  She performed no work for FRB

ATL during this time, October of 2015 to December 31, 2019.  FRB STL was the

only bank that could assign work to Plaintiff, and it  was the only bank that did

assign work to Plaintiff.  FRB STL delegated work to Plaintiff and determined

deadlines for work. She had to receive permission for vacations and work schedule

adjustments from FRB STL. As an SVL analyst for FRB STL, Plaintiff conducted

process improvement for the Supervision Learning Office. Plaintiff recorded her

work attendance in FRB STL's software called "Pinpoint." FRB STL's Operations

Manager Kathryn Kelly was Plaintiff's direct supervisor. Plaintiff did not report to anyone in FRB ATL. FRB STL established Plaintiff's work objectives. FRB STL determined Plaintiff's rate of compensation. FRB STL gave Plaintiff feedback and managed Plaintiff' job performance. From October of 2015 until December 11, 2019, FRB STL conducted Plaintiff's performance reviews. FRB STL determined Plaintiff's work schedule. Plaintiff flew to St. Louis at least twice a year for team meetings. Plaintiff did not travel to Atlanta for work obligations. Plaintiff had monthly meetings with Susan Black. During these meetings, Plaintiff told Black about her progress in different work assignments and projects. Plaintiff met weekly with Kelly. Kelly and Plaintiff discussed Plaintiff's work progress and projects during these meetings. Kelly also discussed Plaintiff's opportunities for promotion in these meetings. She suggested that if Plaintiff completed certain milestones, such as working with multiple lines of business, she would be eligible for a Senior Analyst position at FRB STL.

Construing these allegations as true, Plaintiff's Complaint sufficiently alleges FRB STL was her employer for Title VII purposes.

**Exhaustion of Administrative Remedies**

Defendant argues Plaintiff's July 2018 allegation is untimely because it was not filed within 180 days. According to Defendant, since the Missouri Commission on Human Rights  (MCHR) did not have jurisdiction over Plaintiff's claims, the

300-day limitation period for deferral states is not applicable.  Defendant argues

because Plaintiff's Missouri state discrimination claim would be preempted by the

Federal Reserve Act, 12 U.S.C. § 221, *et seq*., the MCHR, the FEP agency in this

instance, does not have jurisdiction over her claims.

Defendant's position is not as clear cut as Defendant argues.  In support of

its motion, Defendant cites this Court's decision in *Crowe v. Federal Reserve Bank*

*of St. Louis*, 2009 140747 (E.D.Mo. January 9, 2009).  *Crowe*, however addressed

the issue of a cause of action could be maintained against individuals employed by

the Federal Reserve Bank.  The ruling in *Crowe* was based on the state

discrimination laws that go beyond the remedies and protections provided by

federal laws.

Plaintiff's suit does not set forth any claim under the Missouri Human

Rights Act.  It is based solely on the federal discrimination laws such that

preemption is not an issue.  Defendant's argument that the FEP agency would not

have jurisdiction over Plaintiff's claim is a conclusion which has not been resolved

in this Circuit.  *See Betz v. Federal Home Loan Bank of Des Moine*s, No 4:21-CV-

00022, 2021 WL 3046888 (S.D. Iowa July 19, 2021).[2]

---

[2]     It is well settled that "state law that conflicts with federal law is 'without effect' " under the doctrine of preemption. *Cipollone v.*
*Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The doctrine is founded in the Supremacy Clause of
the United States Constitution, which provides that the "Constitution, and the Laws of the United States which shall be made in
Pursuance thereof ... shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

In that the MCHR could have jurisdiction over a claim brought under the

Missouri discrimination laws, Plaintiff would be entitled to the 300-day limitation

---

There are three general categories of preemption: (1) express preemption, where "Congress define[s] explicitly the extent to which its enactments preempt state law"; (2) field preemption, where Congress's regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it" or where an Act of Congress "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject"; and (3) conflict preemption, where state and federal law directly conflict, making it "impossible for a private party to comply with both state and federal requirements" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (citations omitted); *see also CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) ("Where a state statute conflicts with, or frustrates, federal law, the former must give way."); *Nordgren v. Burlington N. R.R. Co.*, 101 F.3d 1246, 1248 (8th Cir. 1996).

*Ewing*, 645 F. Supp. 2d at 710–11.

1.    Plaintiff's Claims Under the ICRA

Here, as in *Ewing*, the Court is faced with a question of conflict preemption. *See id.* at 711 ("Defendants contend that conflict preemption operates to bar Plaintiff's ICRA claim[s] because the ICRA's prohibition of 'unfair employment practices' directly conflicts with FHLB's enabling statute."). The federal statute at issue provides that, once a Federal Home Loan Bank has been incorporated, it has the power "to select, employ, and fix the compensation of ... officers, employees, attorneys, and agents as shall be necessary for the transaction of its business; to define their duties, ... and *to dismiss at pleasure such officers, employees,* attorneys, and agents." 12 U.S.C. § 1432(a) (emphasis added).

In *Ewing*, this Court noted that "[t]he question of whether the 'dismiss at pleasure' provision of the [FHLBA] preempts state anti-discrimination laws is one of first impression in this circuit" and that "[o]ther courts considering the 'dismiss at pleasure' language of § 1432(a) or identical language in the National Bank Act ... and the Federal Reserve Act ... ha[d] considered the issue and reached varying conclusions." 645 F. Supp. 2d at 711–12. This Court closely examined the holdings of the other courts and rejected the position urged by the defendants both in *Ewing* and here—"that the 'dismiss at pleasure' language operates to wholly preempt state employment laws." *Ewing*, 645 F. Supp. 2d at 712. Instead, this Court held state-law discrimination claims under the ICRA are preempted only to the extent such claims are in direct conflict with federal law. *Id.* at 720. Subsequent decisions of other districts in this circuit agree with the Court's conclusions in *Ewing. See Morris v. U.S. Bank*, No. 4:12-cv-281-DPM, 2013 WL 139923, at *2–3 (E.D. Ark. Jan. 10, 2013); *see also Bowen v. U.S. Bank Nat'l Ass'n*, No. 19-cv-2683, 2020 WL 3429698, at *8 (D. Minn. June 22, 2020) (holding that the plaintiff's claim under the state whistleblower law was not preempted by the National Bank Act's dismiss-at-pleasure provision).

Having considered the parties' arguments, the Court follows its prior holding in *Ewing*. Plaintiff's claims under the ICRA for sex discrimination and harassment (Count I) and retaliation (Count III) are preempted to the extent that the provisions of the ICRA are in direct conflict with the provisions of Title VII.

*Betz v. Fed. Home Loan Bank of Des Moines*, No. 4:21-CV-00022, 2021 WL 3046888, at *3–4 (S.D. Iowa July 19, 2021).

period to bring her federal causes of action.  A complainant "must file a charge of discrimination within 300 days of the occurrence under Title VII and within 180 days under MHRA." *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007) (quoting 42 U.S.C. § 2000e-5I(1) and Mo. Rev. Stat. § 213.075(1)). "Missouri is a deferral state, and a work-sharing agreement exists between the EEOC and Missouri Human Rights Commission, so a complaint filed with the EEOC is considered filed with the MHRA on the same date." *Hernton v. Aarons, Inc.*, No. 4:17-CV-01441-AGF, 2018 WL 2364284, at *2 (E.D. Mo. May 23, 2018) (citing Mo. Rev. Stat. § 213.075(2)). "When a Missouri plaintiff files a charge of discrimination with the EEOC, the applicable limitations period extends to 300 days." *Chowdada v. Judge Grp.*, No. 4:18-CV-00655-JAR, 2019 WL 1426283, at *2 (E.D. Mo. Mar. 29, 2019) (citation omitted); *Niekamp v. Missouri*, No. 20-4075-CV-C-WJE, 2020 WL 5350293, at *3 (W.D. Mo. Sept. 4, 2020).

**Retaliation Claims**

Defendant argues Plaintiff's retaliation claims that her supervisors stopped meeting with her; her supervisors ceased conversations about promotional opportunities and her supervisors increased her workload when a co-worker resigned have not been properly exhausted because she did not detail them in her Amended Charge of Discrimination.  Plaintiff counters this argument by pointing out that she checked the retaliation box on the EEOC charge form, therefore, she

argues she sufficiently raised a claim of retaliation against Defendant with regard to the additional claims stated above.  Plaintiff argues the EEOC could reasonably be expected to investigate the three claims Defendant seeks to dismiss.  Plaintiff's argument, however, dispels itself since she included a narrative about her termination.  Under Plaintiff's argument, no narrative would be necessary regarding her termination since she checked the retaliation box.

Even construing the claims liberally, Plaintiff's Amended Charge provides no basis for the EEOC to investigate the claims of retaliation that her supervisors stopped meeting with her, that her supervisors ceased conversations about promotional opportunities, and her supervisors increased her workload when a co-worker resigned . *See Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988) (citations omitted)("The purpose of filing a charge with the EEOC is to provide the Commission an opportunity to investigate and attempt a resolution of the controversy through conciliation before permitting the aggrieved party to pursue a lawsuit."). Thus, "as a general rule, a complainant must file a charge against a party with the EEOC before she can sue that party under Title VII." *Sedlacek v. Hach*, 752 F.2d 333, 336 (8th Cir. 1985); *see also Voss v. Hous. Auth. Of the City of Magnolia, Arkansas*, 917 F.3d 618, 623 (8th Cir. 2019) (a plaintiff is required to file a complaint with the EEOC before filing a suit in federal court.)

While Plaintiff checked the box for "retaliation," she only detailed her termination as her adverse employment action.

"[I]t is not reasonable for the EEOC to look for and investigate such adverse employment actions if they are nowhere mentioned in the administrative charge." *Parisi v. Boeing Co.*, 400 F.3d 583, 586 (8th Cir. 2005). *See also Lenk v. St. Louis Public Schools*, No. 4:18 CV 1296 DDN, 2018 WL 5862747, at *4 (E.D. Mo. Oct. 24, 2018) (finding that the plaintiff failed to exhaust her administrative remedies because not only did she "fail to list [a defendant] as an employer in her EEOC charge, she also fail[ed] to list any of the adverse actions for which she now complains."). Appling this principle to the present matter, it would not have been reasonable for the EEOC to investigate the supervisors' actions based on the allegations in the charge.

In *Sellers v. Deere & Co.*, the Court found that the plaintiff failed to exhaust one of his claims. 791 F.3d 938, 943 (8th Cir. 2015). The plaintiff's charge of discrimination described his increased workload and perceived mistreatment by Deere employees, but failed to mention Deere's company-wide personnel reorganization or his demotion. *Id.* The failure to reference the personnel reorganization or his demotion in his EEOC charge meant that he failed to exhaust his administrative remedies as to that claim and thus the court found he was

prohibited from alleging that the personnel reorganization "effectively demoted him." *Id.* (citing *Parisi*, 400 F.3d at 585–86).

Because Plaintiff failed to include any information that would put the EEOC on notice of these retaliation claims, the court finds that Plaintiff failed to exhaust her administrative remedies as to these claims. *See Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851–53 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–11 (2002)) (other citations omitted). *See also*, *Warren v. Metro Transit*, No. 4:20-CV-00781 SRC, 2021 WL 124315, at *3 (E.D. Mo. Jan. 13, 2021); *Mayes v. Reuter*, No. 4:17 CV 2905 CDP, 2018 WL 2267905, at *6 (E.D. Mo. May 17, 2018) ("Entirely new allegations that appear for the first time in the federal-court complaint should be dismissed for failure to exhaust administrative remedies if the EEOC charge did not provide notice that they would be raised." (citing *Richter*, 686 F.3d at 850–53)).

Thus, for the reasons stated above, the Court finds that Plaintiff failed to exhaust her administrative remedies as to her retaliation claims that her supervisors stopped meeting with her, that her supervisors ceased conversations about promotional opportunities, and her supervisors increased her workload when a co-worker resigned. As such, the Court dismisses these claims.

**Materially Adverse Action**

"An 'increased workload that materially changes an employee's duties can constitute an adverse employment action.' *Sellers v. Deere & Co.,* 791 F.3d 938, 944 (8th Cir.2015)." *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016).

Plaintiff claims that her workload was increased when a co-worker resigned. Plaintiff alleges that she was required to do the work of a Senior Analyst but was not given an increase in pay.  At the time, Plaintiff held the position of SVL Analyst.  Construing the Complaint and the reasonable inferences therefrom, Plaintiff's Complaint is sufficient at this stage to state a materially adverse employment action by requiring her to perform the work of a Senior Analyst as an SVL Analyst.

Regarding the claim that Plaintiff was told that she would be required to accept a decrease in pay if she wanted to remain employed by FRB STL, Plaintiff did not experience a pay decrease.  As such, the Complaint does not plausibly allege a materially adverse employment action.  Accordingly, the Complaint fails to state a claim based on the decrease in pay.

Likewise, the Complaint fails to set forth sufficient facts to state a retaliation claim based on the cessation of the monthly meetings and conversations about promotion opportunities.  The Complaint fails to set forth facts regarding how these actions constitute a materially adverse employment action.

With regard to Plaintiff's termination, Defendant argues that this claim cannot survive challenge because there is no causal connection between Plaintiff's termination and the alleged retaliation.  Construing the Complaint liberally, it alleges Plaintiff was given until December of 2019 to consider her options with regard to continued employment.  The Complaint also alleges that Plaintiff, when she returned from FMLA in October 2019, communicated to Kelly her desire to remain employed by FRB STL. Plaintiff was, however, terminated on December 11, 2019.  Plaintiff contends that the termination was in retaliation for her discrimination claims.  Taking all of these allegations as true, they are sufficient to set forth a causal connection between Plaintiff's termination and her retaliation claim.

## Conclusion

Plaintiff's Complaint sufficiently sets forth claims for discrimination and retaliation with the exceptions discussed herein.

Accordingly

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Dismissal, [Doc. No. 6], is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Plaintiff's claims for retaliation based on her supervisors ceasing to meet with her, ceasing conversations about

promotional opportunities, and increasing her workload when a co-worker resigned are dismissed.

Dated this 15th day of September,  2021.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE